731 F.2d 403
 20 ERC 1801, 14 Envtl. L. Rep. 20,359
 PEOPLE of the STATE OF ILLINOIS, Plaintiff-Appellee,
and
People of the State of Michigan, Intervening Plaintiff-Appellee,
v.
CITY OF MILWAUKEE, The Sewerage Commission of the City of
Milwaukee and The Metropolitan Sewerage Commission
of the County of Milwaukee, Defendants-
Appellants.
William J. SCOTT, on his own behalf and on behalf of all
persons similarly situated, Plaintiff,
v.
CITY OF HAMMOND, INDIANA; United States Environmental
Protection Agency; Douglas M. Costle, Administrator of the
United States Environmental Protection Agency; and the
Hammond-Munster Sanitary District, Defendants,
and
PEOPLE of the STATE OF ILLINOIS and the Metropolitan
Sanitary District of Greater Chicago, a municipal
corporation, Plaintiffs,
v.
The SANITARY DISTRICT OF HAMMOND, a municipal corporation;
Joseph A. Perry; Thomas C. Conley; Gilbert De Lancy;
Theodore Dunajeski; and the City of Hammond, Indiana, a
municipal corporation, Defendants.
 Nos. 77-2246, 81-2236.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 3, 1981.
Decided March 27, 1984.
As Amended on Denial of Rehearing and Rehearing En Banc May 29, 1984.
 
 Jeremiah Marsh, Hopkins & Sutter, Chicago, Ill., Elwin J. Zarwell, Milwaukee, Wis., for defendants-appellants.
 Joseph V. Karaganis, Philip B. Kurland, Rothschild, Barry & Myers, Chicago, Ill., for plaintiff-appellee.
 Before SPRECHER, Circuit Judge,* CUDAHY, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 These appeals involve resort by a state (in one case by a citizen of that state) to state law nuisance remedies to deal with pollution of its portion of an interstate body of water, resulting from the discharge of pollutants in another state.
 
 
 2
 Appeal No. 77-2246 (the Milwaukee case) is here on remand from the Supreme Court of the United States. Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (Milwaukee II ). Appeal No. 81-2236 is an interlocutory appeal in cases to which we shall refer as the Hammond Cases.
 
 I. THE MILWAUKEE CASE
 
 3
 In Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (Milwaukee I ), the Supreme Court denied Illinois leave to file a bill of complaint under the Court's original jurisdiction. Illinois alleged pollution of Lake Michigan by the present defendants and other Wisconsin cities, and sought abatement of a public nuisance. The Court held that the federal common law of nuisance would govern, and that a district court would have federal question jurisdiction. Although an "original suit normally might be the appropriate vehicle for resolving this controversy, we exercise our discretion to remit the parties to an appropriate district court whose powers are adequate to resolve the issues." 406 U.S. at 108, 92 S.Ct. at 1395.
 
 
 4
 In May, 1972, a month after Milwaukee I, Illinois brought this action in the United States District Court for the Northern District of Illinois. One count claimed a public nuisance and invoked federal law, citing Milwaukee I; one claimed a violation of an Illinois statute, the Environmental Protection Act; and one claimed a public nuisance under Illinois common law. An injunction was sought. The State of Michigan was granted leave to intervene as a party plaintiff in August, 1972.
 
 
 5
 In August, 1977, after trial, the district court made findings that defendants dump substantial quantities of pathogen-containing sewage into Lake Michigan each year, that the lake currents carry the pathogens into Illinois waters where they may infect drinking water supplies and pose a danger to swimmers, and that the phosphorous in the discharges made a substantial contribution to the accelerated eutrophication of Lake Michigan. People of the State of Illinois v. City of Milwaukee, 599 F.2d 151, 167-69 (7th Cir.1979) (Milwaukee 7th Cir.). Injunctive relief, including changes in the operation of defendant's sewage system, was granted. 599 F.2d at 169-70.
 
 
 6
 The district judge stated his belief that he had jurisdiction to try all three counts.
 
 
 7
 I have concluded that the case should be decided under the Federal common law of nuisance, but I further believe that the elements required under that cause of action are also the same elements which the Court would have to find under the two State claims. Therefore, in my view, it makes no practical difference that the court is taking the case on all three counts.
 
 
 8
 On appeal, this court noted,
 
 
 9
 [p]laintiff also relies on Illinois statutory and common law. The district court indicated that under any of the asserted grounds for relief the result would be the same. But it is federal common law and not state statutory or common law that controls in this case. Illinois v. Milwaukee, supra, 406 U.S. at 107 & n. 9, 92 S.Ct. 1385 [at 1394 & n. 9] and therefore we do not address the state law claims.
 
 
 10
 599 F.2d 151, 177 n. 53.
 
 
 11
 In affirming as to liability and portions of the relief, we held that the federal common law of nuisance had not been preempted by 1972 FWPCA, the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. Sec. 1251 et seq. (nor the 1977 Amendments to the same Act).
 
 
 12
 The Supreme Court granted Milwaukee's petition for certiorari, 445 U.S. 926, 100 S.Ct. 1310, 63 L.Ed.2d 758 "to consider the effect of [the 1972] legislation on the previously recognized cause of action." 451 U.S. at 308, 101 S.Ct. at 1788. The Court concluded that Congress had so completely occupied the field as to supplant federal common law. "[T]here is no basis for a federal court to impose more stringent limitations ... by reference to federal common law ...." Milwaukee v. Illinois, 451 U.S. 304, 320, 101 S.Ct. 1784, 1794, 68 L.Ed.2d 114 (1981) (Milwaukee II ). The Court vacated the judgment of this court and remanded "for proceedings consistent with this opinion."
 
 
 13
 Illinois had also applied for certiorari, including as one of its questions, "(3) Was appellate court correct in disregarding claims made by Illinois under Illinois law, both under state common law of nuisance and under Illinois Environmental Protection Act?" 48 U.S.L.W. 3341. In Milwaukee II, decided April 28, 1981, the Court noted:
 
 
 14
 The complaint also sought relief, in counts II and III, under Illinois statutory and common law. See App. 29-32. The District Court stated that "the case should be decided under the principles of the federal common law of nuisance," App. to Pet. for Cert. F-2, but went on to find liability on all three counts of the complaint, id. at F-24. The Court of Appeals ruled that "it is federal common law and not state statutory or common law that controls in this case, Illinois v. Milwaukee, supra, 406 U.S., at 107, & n. 9 [92 S.Ct., at 1394, & n. 9], ... and therefore we do not address the state law claims." 599 F.2d at 177, n. 53. Although respondent Illinois argues this point in its brief, the issue before us is simply whether federal legislation has supplanted federal common law. The question whether state law is also available is the subject of Illinois' petition for certiorari, No. 79-571.
 
 
 15
 451 U.S. 304, 310 n. 4, 101 S.Ct. 1784, 1789 n. 4, 68 L.Ed.2d 114.
 
 
 16
 On May 18, 1981, the Court denied the Illinois petition. 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 839.
 
 
 17
 On remand, Illinois again asks us to affirm, this time on the basis of the state law claims. Our jurisdiction to consider the state law claims is at least unclear. It is clear that the Supreme Court refused to review our declining to consider state law as support for the district court judgment and at least doubtful that the direction to us on remand includes our reconsideration of that issue.
 
 
 18
 But even if our considering Illinois law nuisance or statutory claims in No. 77-2246, the Milwaukee case, is thus foreclosed, very similar claims are present in the Hammond cases, and any limitation on our consideration of state law claims which arises from the procedural posture of No. 77-2246 would not apply in No. 81-2236.
 
 II. THE HAMMOND CASES
 A. The Scott Complaint
 
 19
 On August 21, 1980, William J. Scott, suing as a citizen of Illinois, commenced a class action in the United States District Court for the Northern District of Illinois. The complaint alleged that two Indiana municipal corporations, the Hammond Sanitary District and the City of Hammond, had discharged raw and inadequately treated sewage into Lake Michigan, that the sewage created a public health hazard in Illinois, and that the Indiana municipal corporations' conduct "constitutes both a public and private nuisance under Illinois law and independently both a public and private nuisance under federal common law." Scott's complaint alleged federal jurisdiction based on both diversity of citizenship and the existence of a federal question under the federal common law of nuisance.
 
 B. The Illinois Complaint
 
 20
 On September 5, 1980, Illinois and the Metropolitan Sanitary District of Greater Chicago (collectively "Illinois") filed a complaint in the Circuit Court of Cook County, Illinois, against the City of Hammond, the Hammond Sanitary District, and the District's manager and trustees (collectively "Hammond"). In addition to the federal common law and state common law nuisance claims asserted in Scott's federal complaint, the Illinois complaint alleged a trespass under Illinois common law, a violation of the Illinois Pollution Control Board's water quality standards, and a violation of Illinois Environmental Protection Act. On the petition of Hammond, the case was removed to federal court on the ground that the federal common law of nuisance provided federal question jurisdiction and that pendent jurisdiction existed over the state law claims. On October 20, 1980, the District Court denied the plaintiffs' motion to remand the case to the state court. Illinois v. Sanitary District of Hammond, 498 F.Supp. 166 (N.D.Ill.1980).
 
 
 21
 On June 24, 1981, based upon Milwaukee II, the district court granted Hammond's motions to dismiss the federal common law nuisance claims. The district court denied dismissal of plaintiffs' state law claims, but certified its ruling for an interlocutory appeal under 28 U.S.C. Sec. 1292(b). Scott v. City of Hammond, 519 F.Supp. 292, 298 (N.D.Ill.1981). We permitted the appeal.
 
 
 22
 Illinois argues for affirmance.
 
 III. JURISDICTION
 
 23
 In the Milwaukee case, Illinois stated a claim under the federal common law of nuisance and invoked federal question jurisdiction, consistent with Milwaukee I. The case was begun before enactment of 1972 FWPCA. Plaintiffs in the Hammond cases stated similar claims. Although these cases came to the federal court after enactment of 1972 FWPCA, Milwaukee II had not yet been decided, establishing that the federal common law had been supplanted by FWPCA. Thus in all the cases the federal claim was initially substantial, and federal question jurisdiction appropriate. In all the cases, the district court could properly and did accept and retain pendent jurisdiction of state law claims. It is not essential to the retention of pendent jurisdiction that the federal issue remain alive throughout. See Rosado v. Wyman, 397 U.S. 397, 405, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970).
 
 
 24
 Scott, suing the Hammond defendants as a citizen of Illinois, claimed injury in the impairment of his own regular recreational use of Lake Michigan and invoked diversity jurisdiction as to his state law claim. There could not, however, be diversity jurisdiction of the actions brought by Illinois. Milwaukee I, 406 U.S. at 97 n. 1, 92 S.Ct. at 1389 n. 1.
 
 
 25
 In personam jurisdiction over the municipal corporation defendants was based on service under the Illinois long arm statute, on the theory that defendants through conduct outside of Illinois were causing injury within Illinois and were therefore committing tortious acts within the state. Milwaukee 7th Cir., 599 F.2d at 155, 156; Milwaukee II, 451 U.S. at 312 n. 5, 101 S.Ct. at 1790 n. 5.
 
 IV. PREEMPTION
 
 26
 The issue in all of these cases is whether there is a body of federal law in the area of interstate water pollution which precludes the application of one state's common or statutory law to determine liability and afford a remedy for discharges, in particular by a municipality, within another state.
 
 
 27
 Illinois suggests that Illinois common law controlled this case until Milwaukee I judicially promulgated federal common law, and that since the 1972 FWPCA dissipated federal common law, Illinois law must again control. Illinois argues,
 
 
 28
 [i]n sum, even if the promulgation of federal common law in Milwaukee I displaced the otherwise applicable state law under the Supremacy Clause, the preemptive effect of that body of federal law dissipated upon its own demise in Milwaukee II. And, unless the FWPCA itself preempts the application of state law, there is nothing to prevent the states from now acting in this field.
 
 
 29
 Plaintiff-Appellee Illinois' Brief at pp. 12-13. Illinois goes on to argue that the 1972 FWPCA does not have such a preemptive effect because it does not evidence a "clear and manifest purpose" of Congress to preempt state law, and therefore state law nuisance remedies are available.
 
 
 30
 The defendants argue that Milwaukee II has a different effect on Milwaukee I and Milwaukee 7th Cir. They contend that the Supreme Court, in Milwaukee I, determined that interstate pollution disputes fall within the category of controversies touching basic interests of federalism which require the application of federal law and preclude the application of a state's laws to discharges occurring outside the state. In Milwaukee I the Court held that the governing federal law was federal common law. In Milwaukee II, federal statutory law, the 1972 FWPCA, supplanted federal common law, but continued to preclude the application of state law to out-of-state discharges, except as affirmatively permitted by the 1972 FWPCA.
 
 
 31
 The district court, in the Hammond cases, essentially took the position of the Illinois plaintiffs. The district judge denied dismissal of the plaintiffs' state law claim holding that Milwaukee II must be interpreted as repudiating the entire Milwaukee 7th Cir. opinion, including footnote 53 which stated that federal common law, not state law, is controlling, thus leaving unresolved the issue of the application of state law to discharges of alleged pollutants within another state by a municipal body of that state. The district judge then went on to find that the application of state law is not precluded by virtue of the basic interests of federalism in controlling interstate water pollution nor preempted by the 1972 FWPCA.
 
 
 32
 In Milwaukee I, the Supreme Court articulated a number of reasons for applying federal common law to the issue of interstate water pollution. The Court examined the federal statutes touching interstate waters, including the Federal Water Pollution Control Act as it existed prior to the 1972 Amendments. The Court held that "the Act makes clear that it is federal, not state, law that in the end controls the pollution of interstate or navigable waters." 406 U.S. at 102, 92 S.Ct. at 1392. The Court went on to hold that the statutory remedies provided by Congress did not encompass the remedy sought by Illinois and that federal common law remedies must therefore fill the gap.
 
 
 33
 Milwaukee I's second reason for applying federal law was the character of the parties. It is clear, however, that the federal nature of the problem, and the basic interests of federalism do not depend on the case being a state versus state case. See note 6 of Milwaukee I, following. It may well be significant, however, that, except for the case in which Scott is plaintiff, these are attempts by a state to regulate municipalities of another state in the discharge of their public responsibilities.
 
 
 34
 The opinion's third reason for applying federal common law to interstate pollution disputes was that the basic interests of federalism and the federal interest in a uniform rule of decision in interstate pollution disputes required the application of federal law. The court stated, "Rights in interstate streams, like questions of boundaries, 'have been recognized as presenting federal questions'[6]." 406 U.S. at 105, 92 S.Ct. at 1393. In footnote 6 the Court said:
 
 
 35
 Thus, it is not only the character of the parties that requires us to apply federal law. * * * As Mr. Justice Harlan indicated for the Court in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 421-27, 84 S.Ct. 923, 936-39, 11 L.Ed.2d 804, where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism, we have fashioned federal common law. * * * Certainly these same demands for applying federal law are present in the pollution of a body of water such as Lake Michigan, bounded, as it is, by four states.
 
 
 36
 406 U.S. at 105 n. 6, 92 S.Ct. at 1393 n. 6. The Court went on to quote from the Tenth Circuit's statement in Texas v. Pankey, 441 F.2d 236 (10th Cir.1971), that:
 
 
 37
 Federal common law and not the varying common law of the individual States is, we think, entitled and necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources outside of its domain.
 
 
 38
 406 U.S. at 107 n. 9, 92 S.Ct. at 1394 n. 9. In deciding that federal law controlled in interstate water pollution disputes, the court overruled its position in Ohio v. Wyandotte Chemicals Corp., 401 U.S. 493, 91 S.Ct. 1005, 28 L.Ed.2d 256 (1971), that state law (of the state within which pollution caused a nuisance) controlled interstate water pollution disputes. 406 U.S. 102 n. 3, 92 S.Ct. 1392 n. 3, as interpreted by the Court, 451 U.S. at 327 n. 19, 101 S.Ct. at 1797 n. 19.
 
 
 39
 When Illinois v. Milwaukee reached this court for the first time, Milwaukee 7th Cir., 599 F.2d 151, we followed the rationale of Milwaukee I to hold that "[i]t is federal common law and not state statutory or common law that controls in this case." 599 F.2d at 177 n. 53.
 
 
 40
 In City of Evansville, Indiana v. Kentucky Liquid Recycling, 604 F.2d 1008 (7th Cir.1979), cert. denied, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980), three Indiana municipal corporations brought suit to recover damages incurred because of the defendant's discharges of contaminants into the river from the State of Kentucky. The complaint alleged claims based upon both federal and state law. Relying primarily upon Milwaukee I, this court held that the district court had subject matter jurisdiction of plaintiffs' claim under the federal common law of interstate water pollution.
 
 
 41
 [T]here can be little doubt that the reasons the Supreme Court found compelling for declaring a federal common law of interstate water pollution are applicable here. The plaintiffs are municipal or public corporations, subdivisions of the state, that were required to spend public funds because of pollution of an interstate waterway by acts done in another state. The interests of the state in this interstate pollution dispute are implicated in the same way such interests were implicated in Illinois v. Milwaukee.[30]
 
 In footnote 30 we said:
 
 
 [30]
 Cf. Hinderlider v. LaPlata River & Cherry Creek D. Co., 304 U.S. 92, 110, 58 S.Ct. 803 82 L.Ed. 1202 (1938) (interstate water apportionment); see also Georgia v. Tennessee Copper Co., 206 U.S. 230, 238, 27 S.Ct. 618 51 L.Ed. 1038 (1907) (implicitly assuming that even a private party might file suit to enjoin interstate air pollution); Committee for Jones Falls Sewage System v. Train, supra, 539 F.2d [1006] at 1009 n. 8. Originating in Pennsylvania, the Ohio River is the boundary between Ohio and West Virginia, Ohio and Kentucky, Indiana and Kentucky, and Illinois and Kentucky, and empties into the Mississippi River. Each of these states has an interest in the use of the river, but the laws of one state cannot control the use of the river by citizens of other states. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964) (Hinderlider "implies that no State can undermine the federal interest in equitably apportioned interstate waters even if it deals with private parties").
 
 
 
 42
 604 F.2d at 1018 (emphasis added).
 
 
 43
 In Milwaukee II the issue before the Supreme Court was solely whether federal legislation had supplanted federal common law. The case did not address the holding in Milwaukee 7th Cir. that state law was inapplicable to interstate water pollution disputes.
 
 
 44
 The Court of Appeals ruled that "it is federal common law and not state statutory or common law that controls in this case, Illinois v. Milwaukee, supra, 406 U.S., at 107, & n. 9 [92 S.Ct., at 1394, & n. 9], ... and therefore we do not address the state law claims." 599 F.2d, at 177, n. 53. Although respondent Illinois argues this point in its brief, the issue before us is simply whether federal legislation has supplanted federal common law. The question whether state law is also available is the subject of Illinois' petition for certiorari, No. 79-571.
 
 
 45
 451 U.S. at 310 n. 4, 101 S.Ct. at 1789 n. 4. In addition, the Court specifically reaffirmed its prior overruling in Milwaukee I of the position in Ohio v. Wyandotte Chemicals Corp. that state law controlled interstate water pollution disputes. 451 U.S. at 327 n. 19, 101 S.Ct. at 1797 n. 19.[1] Thus, when the Court vacated and remanded the case to the Seventh Circuit, it had dealt only with what federal law applied and did not affect this court's holding that Illinois law was inapplicable. See People of the State of Illinois v. Lever Brothers Company, 530 F.Supp. 293, 295 (N.D. Illinois 1981).
 
 
 46
 The Supreme Court continues to cite Milwaukee I for the inapplicability of state law to interstate conflicts implicating conflicting state interests despite the displacement of federal common law by FWPCA recognized in Milwaukee II. In Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), the Supreme Court again articulated the federal nature of interstate water pollution disputes:
 
 
 47
 [A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, [footnote omitted] interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations,[13] and admiralty cases [footnotes omitted]. In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control.
 
 
 48
 451 U.S. at 641, 101 S.Ct. at 2067 (emphasis added). Footnote 13 said,
 
 
 49
 See, e.g., Illinois v. Milwaukee, 406 U.S. 91 [92 S.Ct. 1385, 31 L.Ed.2d 712] (1972); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 [84 S.Ct. 923, 11 L.Ed.2d 804] (1964); Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92 [58 S.Ct. 803, 82 L.Ed. 1202] (1938). Many of these cases arise from interstate water disputes. Such cases do not directly involve state boundaries, disputes over which more often come to this Court under our original jurisdiction; they nonetheless involve especial federal concerns to which federal common law applies. In Hinderlider v. La Plata River & Cherry Creek Ditch Co., supra, at 110 [58 S.Ct. at 810], decided the same day as Erie, the Court observed:
 
 
 50
 "Jurisdiction over controversies concerning rights in interstate streams is not different from those concerning boundaries. These have been recognized as presenting federal questions."
 
 
 51
 451 U.S. at 641, 101 S.Ct. at 2067.
 
 
 52
 In its opinion in the Hammond cases, the district court held that,
 
 
 53
 [t]he issue of regulating and preventing water pollution does not present the same type of unresolvable conflict of state interests that the apportionment of boundaries and water rights does. In the latter situations, a limited quantity of land or water must be divided among competing state interests. Thus, only resort to federal law and authority can resolve those matters. In the water pollution control field, however, the issue is not dividing the pie but determining which standards will regulate discharges and provide remedies for injuries. It is theoretically possible that no conflicts will occur among the states because they agree on standards and remedies needed to protect the water. But in the more realistic situation where one or the other set of rules must be recognized as controlling, to adopt the more stringent laws does not deprive the other state of any water rights. Indeed, the benefits of stronger controls would redound to all states involved.
 
 
 54
 This interpretation misstates the nature of interstate water pollution disputes. The issue is in fact "dividing the pie," i.e., the equitable reconciliation of competing uses of an interstate body of water, Lake Michigan. The discharge of effluents into interstate waters as a consequence of sewage treatment is a use of the lake, as is its use for drinking water or recreation. To the extent that those and other uses impinge upon or compete with one another, the limited resource of Lake Michigan must be equitably apportioned among them. Such apportionment will doubtless reflect a policy that some uses are more socially desirable than others, but the policy must be articulated and implemented through legislative or judicial action. When this competition for the use of an interstate body of water involves the interests of different states, apportionment among users is a matter of special federal concern and the subject of federal law. Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641 n. 13, 101 S.Ct. 2061, 2067 n. 13, 68 L.Ed.2d 500 (1981); Illinois v. Milwaukee, 406 U.S. 91, 105, 92 S.Ct. 1385, 1393, 31 L.Ed.2d 712 (1972); Texas v. Pankey, 441 F.2d 236, 241-42 (10th Cir.1971); Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 110, 58 S.Ct. 803, 810, 82 L.Ed. 1202 (1938); Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907).
 
 
 55
 Effluent limitations on discharges into Lake Michigan prescribed in permits under the authority of 1972 FWPCA accomplish apportionment of the uses of Lake Michigan under federal law, albeit statutory rather than common law. To allow one state to impose more stringent limitations on discharges within a second state would impair this apportionment of water use to the latter state. To argue that all states have an interest in abating water pollution and therefore the interstate application of one state's more stringent standards would benefit all is too simplistic. There are legitimate state concerns on both sides of the question. In the present cases the political subdivisions of one state claim a right to an extent of use of interstate water in the exercise of their public health functions. A different state complains that a use to that extent causes contamination of its waters and is inimical to public health because those waters are used for water supplies and recreation. This is a controversy of federal dimensions, implicating the conflicting rights of states and inappropriate for state law resolution. The latter state does not seek mere enforcement of effluent limitations established under federal law, but imposition of more stringent limitations.
 
 
 56
 The very reasons the Court gave for resorting to federal common law in Milwaukee I are the same reasons why the state claiming injury cannot apply its own state law to out-of-state discharges now. Milwaukee II did nothing to undermine that result.[2] The claimed pollution of interstate waters is a problem of uniquely federal dimensions requiring the application of uniform federal standards both to guard states against encroachment by out-of-state polluters and equitably to apportion the use of interstate waters among competing states. Given the logic of Milwaukee I and Milwaukee II, we think federal law must govern in this situation except to the extent that the 1972 FWPCA (the governing federal law created by Congress) authorizes resort to state law.[3]
 
 V. 1972 FWPCA
 
 57
 The 1972 FWPCA was characterized by the Supreme Court as "an all encompassing program of water pollution regulation" whose major purpose was "to establish a comprehensive long-range policy for the elimination of water pollution." Milwaukee II, 451 U.S. at 318, 101 S.Ct. at 1723, People, etc. v. Outboard Marine Corp., Inc., 680 F.2d 473, 477 (7th Cir.1982). Part of that comprehensive policy involves recognizing, preserving, and protecting "the primary responsibilities and rights of states to prevent, reduce, and eliminate pollution, [and] to plan the development and use (including restoration, preservation, and enhancement) of land and water resources." 33 U.S.C. Sec. 1251(b). In addition, the Act encourages cooperative activities by the states and uniform state laws relating to the prevention, reduction, and elimination of pollution. 33 U.S.C. Sec. 1253.
 
 
 58
 1972 FWPCA contemplates cooperative exercise of jurisdiction by the state within which discharges occur. For example, a state may obtain authority to administer its own permit program for discharges into navigable waters within its jurisdiction. Section 1342(b) and (c).[4]
 
 
 59
 There are other provisions specifically addressed to protection of the interests of a state whose waters may be affected even though the discharges under consideration occur in a different state. Thus where the Administrator issues a compliance order, he must send a copy to "other affected states" as well as the state in which the violation occurs. Section 1319(a)(4). When an application for federal license or permit is received, and the Administrator determines that the discharge may affect the quality of the waters of any other state, he must notify such other state. That state may then object, be entitled to a hearing, and obtain appropriate conditions to the license or permit. Section 1341(a)(2). A state permit program under Sec. 1342(b) must insure that a state whose waters may be affected receive notice, an opportunity for public hearing and the right to submit recommendations, with notice to the Administrator if its recommendations are not accepted. Section 1342(b)(3) and (5). The Administrator has power to prevent issuance of the permit. Section 1342(d)(2). Section 1365 authorizes a civil action to enforce an effluent standard or limitation. The civil action may be brought against a violator (or the Administrator) by any person having an interest adversely affected, including a state. Subsection (h) authorizes a Governor to bring an action against the Administrator for failure "to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State, or is causing a violation of any water quality requirement in his State." Subsection (c)(1) permits the action to be brought only in the judicial district in which the source is located.[5] ]
 
 
 60
 Section 1370 has at times been referred to as a saving clause. It provides in subsection (1) that except as expressly provided, nothing in FWPCA shall preclude or deny the right of any state or political subdivision thereof or interstate agency to adopt or enforce a standard or limitation respecting discharges of pollutants or any requirement respecting control or abatement of pollution except that any effluent limitations, etc., may not be less stringent than those in effect under FWPCA.[6] In the light of the structure of FWPCA, with its emphasis upon the role of the state where the discharge in question occurs, except for provisions expressly protecting the interests of other states, and in the light of the conflict and confusion which could result from any different construction, we conclude that this provision refers to the right of a state with respect to discharges within that state, and not to any right of a state to impose more stringent limitations upon discharges in another state.
 
 
 61
 Section 1370(2) requires that except as expressly provided nothing in FWPCA shall be construed as impairing or in any manner affecting any right or jurisdiction of the states with respect to the waters (including boundary waters) of such states. Illinois suggests that because the discharges in Wisconsin and Indiana cause an adverse effect within the boundary waters of Illinois, this provision saves its jurisdiction to apply its laws so as to regulate activity in Wisconsin and Indiana in order to avoid the effect in the future. We read Milwaukee I as holding that Illinois law could not be used in this situation so that there was no right or jurisdiction to be saved. In any event, in the light of the structure of FWPCA and the potential conflict and confusion, we think Congress intended no more than to save the right and jurisdiction of a state to regulate activity occurring within the confines of its boundary waters.[7]
 
 
 62
 Subsection (e) of Sec. 1365, authorizing a suit for enforcement in the federal judicial district in which the source is located, contains similar saving clause language:
 
 
 63
 Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).
 
 The Supreme Court concluded this
 
 64
 subsection is common language accompanying citizensuit provisions and ... means only that the provision of such suit does not revoke other remedies. It most assuredly cannot be read to mean that the Act as a whole does not supplant formerly available federal common-law actions but only that the particular section authorizing citizen suits does not do so.
 
 
 65
 Milwaukee II, 451 U.S. at 329, 101 S.Ct. at 1798.
 
 
 66
 This provision may well preserve a right under statutes or the common law of the state within which a discharge occurs (State I) to obtain enforcement of prescribed standards or limitations, and we see no reason why such a right could not be asserted by an out-of-state plaintiff injured as a result of the violation. However, it seems implausible that Congress meant to preserve or confer any right of the state claiming injury (State II) or its citizens to seek enforcement of limitations on discharges in State I by applying the statutes or common law of State II. Such a complex scheme of interstate regulation would undermine the uniformity and state cooperation envisioned by the Act. For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states. Dischargers would be forced to meet not only the statutory limitations of all states potentially affected by their discharges but also the common law standards developed through case law of those states. It would be virtually impossible to predict the standard for a lawful discharge into an interstate body of water. Any permit issued under the Act would be rendered meaningless. In our opinion Congress could not have intended such a result.
 
 
 67
 There is nothing to suggest that the actions before us were brought to seek enforcement of an effluent standard or limitation. In any event we think that the reference in Sec. 1365(e) to statute or common law, like the reference to right or jurisdiction of a state in Sec. 1370, is to a statute or the common law of the state in which the discharge occurs.[8]
 
 VI. CONCLUSION
 A. Milwaukee Case
 
 68
 Illinois asks us to affirm the district court judgment on the basis of the Illinois state law claims. It has not sought to enforce an effluent limitation under Wisconsin statutory or common law nor sought to enforce federal limitations as provided for under the 1972 FWPCA. Because we hold that the logic of Milwaukee I and Milwaukee II and the 1972 FWPCA preclude the type of application of state law sought by Illinois in the area of interstate water pollution, the judgment of the district court is reversed and the case remanded for dismissal.
 
 B. Illinois v. Hammond
 
 69
 The pleadings in this case and the Scott case make it clear that the causes of action asserted rely on the application of Illinois statutory and common law. Nothing in the pleadings suggests a resort to Indiana law or the 1972 FWPCA. The order of the district court is reversed and the case remanded for dismissal.
 
 C. Scott v. Hammond
 
 70
 There is an additional reason for dismissal of the Scott complaint, apart from the preclusive effect of 1972 FWPCA on a cause of action based on the Illinois law of nuisance. He has not alleged harm of a kind different from that suffered by other members of the public exercising the right common to the general public which was allegedly interfered with by defendants. RESTATEMENT (SECOND) OF TORTS Sec. 821C (1977). The order of the district court is reversed and the case remanded for dismissal.
 
 
 
 *
 Circuit Judge Robert A. Sprecher heard oral argument and voted at the post-argument conference to affirm. He died on May 15, 1982, before the preparation of this opinion
 
 
 [1]
 In addition to Ohio v. Wyandotte Chemicals Corp., plaintiffs rely on Askew v. American Waterways Operators, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), and Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1962), to establish a state's power to control pollution of its boundary waters, but the reliance is misplaced. In Askew the Supreme Court upheld Florida's power to impose liability for oil spills occurring within its own territorial waters. Nothing in the opinion indicates that Florida would have been able to extend that power to spills occurring in the territorial waters of other states. Similarly, nothing in Huron Portland Cement suggests that Detroit could have enforced its air pollution laws against ships outside of Michigan waters. Illinois remains free to regulate pollution of Lake Michigan from sources within Illinois, but it may not extend that regulatory authority to sources beyond its own borders
 
 
 [2]
 Our decision here is limited to the context of these cases, and to a holding that a remedy provided by the law of Illinois is not available herein. We do not address other dimensions of the complex legal issues that may be presented in transboundary pollution cases brought in the domestic courts of the state of discharge or the state of impact. See, e.g., Michie v. Great Lakes Steel Division, National Steel Corp., 495 F.2d 213, 215 (6th Cir.) (application of law of state of discharge to international pollution dispute), cert. denied, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974); Sierra Club v. Adams, 578 F.2d 389, 391 n. 14 (D.C.Cir.1978) (application of United States law to federal government actions abroad affecting environment). See also Ohio v. Wyandotte Chemical Corp., 401 U.S. 493, 502-03, 91 S.Ct. 1005, 1011-12, 28 L.Ed.2d 256 (1971) (involvement of many state, interstate and international agencies in water pollution dispute supported Court's denial of leave to file original complaint); Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (applying federal common law to interstate air pollution dispute). Nothing in our decision precludes the application of Wisconsin or Indiana law by state or federal courts in one of those states at the suit of out of state parties affected by discharges in that state
 
 
 [3]
 We recognize that in the ordinary interstate tort the Constitution does not preclude the application of one state's law to determine liability and afford a remedy for acts done in another state and producing injury within the forum state. Justice Brandeis, writing for the Court in Young v. Masci, 289 U.S. 253, 258-59, 53 S.Ct. 599, 601, 77 L.Ed. 1158 (1933) stated:
 A person who sets in motion in one State the means by which injury is inflicted in another may, consistently with the due process clause, be made liable for that injury whether the means employed be a responsible agent or an irresponsible instrument. The cases are many in which a person acting outside the State may be held responsible according to the law of the State for injurious consequences within it. Thus, liability is commonly imposed under such circumstances for homicide, Commonwealth v. Macloon, 101 Mass. 1; for maintenance of a nuisance, State v. Lord, 16 N.H. 357, 359; for blasting operations, Cameron v. Vandergriff, 53 Ark. 381, 386, 13 S.W. 1092; and for negligent manufacture, MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050.
 In State v. Lord, an obstruction to a ditch in Maine caused the runoff of heavy rains to damage a road in New Hampshire. Other cases also recognized that an act which affects waters flowing between states performed in one state will give rise to a cause of action in another state if the effect on the water causes damage in the second state. See Thayer v. Brooks, 17 Ohio 489 (1848) (draining a swamp in Pennsylvania injured a mill in Ohio); Howard v. Ingersoll, 17 Ala. 780 (1850) (dam on river in Georgia injured mill in Alabama) reversed on other grounds, 54 U.S. (13 How.) 381, 14 L.Ed. 189 (1852) (jury improperly instructed on boundary; damaged mill may well have been in Georgia); St. Louis & S.F.R. Co. v. Craigo, 10 Tex.Civ.App. 238, 31 S.W. 207 (1895) (construction in Indiana Territory redirected river currents causing injury to land in Texas). But see Gilbert v. Moline Water Power & Manufacturing Co., 19 Iowa 319 (1866) (Iowa courts cannot take cognizance of the nuisance which resulted in flooding of Iowa lands when the river dividing Illinois from Iowa was dammed between an island in Illinois and the Illinois mainland).
 These cases are consistent with the general common law characterization of actions for damages to real property as local and therefore maintainable only in the state wherein the damaged land lies. Ellenwood v. Marietta Chair Co., 158 U.S. 105, 107, 15 S.Ct. 771, 39 L.Ed. 913 (1895); Livingston v. Jefferson, 15 F.Cas. 660 (C.C.D.Va.1811) (No. 8,411); Wooster v. Great Falls Manufacturing Co., 39 Me. 246, 249 (1855) (dam across river between Maine and New Hampshire injured real estate in Maine); Eachus v. Trustees of the Illinois & Michigan Canal, 17 Ill. 534 (1856) (dam in Illinois injured Indiana land; suit can only be brought in Indiana); RESTATEMENT (SECOND) OF CONFLICT OF LAWS Sec. 87, comment a (1969). Nonetheless, we think it evident from Milwaukee I that this doctrine is not applicable to the determination of liability and remedy for discharges within one state by its municipalities into an interstate body of water, which by their nature implicate uniquely federal concerns. In addition, the conflict and confusion which would arise from the imposition by the second state of a more restrictive effluent standard than would be applicable under FWPCA counsels rejection of this doctrine in the present circumstances.
 
 
 [4]
 The Governor of each state is responsible for identifying each area within his state which has substantial water quality control problems. Where such area is located in two or more states, the Governors shall consult and cooperate. Section 1288. The federal Administrator shall modify certain requirements "with the concurrence of the State." Section 1311(g)(1), (h). The state (if appropriate) may grant certain time extensions. Section 1311(k). A state with an approved permit program may, in consultation with the Administrator, establish a compliance date where an innovative production process will be used. Section 1311(k). A state has certain primary responsibilities with respect to adopting and revising water quality standards, and making determinations and plans with respect to attainment of such standards. Section 1313. Each state is required to report on water quality of all navigable waters in such state. Section 1315. Each state may develop a procedure under state law for applying standards of performance for new sources in such state. Section 1316(c). Each state has primary responsibilities for enforcement of limitations in a permit issued by that state. Section 1319(a)(1). A state has certain powers with respect to sewage discharged from vessels into waters within such state. Section 1322(f), (3) and (4). Each state has certain responsibilities with respect to all publicly owned fresh water lakes in such state. Section 1324. The state (if appropriate) may impose different effluent limitations with respect to the thermal component of discharges. Section 1326(a). An applicant for federal license or permit shall provide a certification by the state in which the discharge originates. Section 1341(a). There are provisions for a state permit program for discharge of dredged or fill material within the state, with procedures to protect the interests of other states, the waters of which may be affected. Section 1344. It seems clear that where these provisions recognize or confer power upon a state, the reference is to the state within which the discharges under consideration occur
 
 
 [5]
 Illinois' basic grievance is that the permits issued to Milwaukee pursuant to the Act do not impose stringent enough controls on the discharges. Nevertheless, Illinois failed to participate in the permit issuing process when the Milwaukee permits were issued. See Milwaukee II, 451 U.S. at 325, 326, 101 S.Ct. at 1796, 1797. In light of the FWPCA's preemption of federal common law, that process seems now to be the appropriate federal forum for adjusting the competing claims of states in the environmental quality of interstate waters. Illinois' failure to participate in that process cannot now justify unilateral application of Illinois law to these discharges. If Illinois desires more stringent protection from out-of-state discharges, it must turn in the first instance to the EPA and federal law for the equitable accommodation of its interests
 
 
 [6]
 On its face it is arguable that Sec. 1370 contemplates only legislatively or administratively prescribed state standards. The Supreme Court has suggested, however, that it may refer to effluent limitations imposed as a result of court decrees under the common law of nuisance
 In fact the Senate Report on the FWPCA Amendments of 1972 stated with respect to the saving clause:
 "It should be noted, however, that the section would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. Compliance with requirements under this Act would not be a defense to a common law action for pollution damages." S.Rep. No. 92-414, p. 81 (1971) (Emphasis added).
 See also S.Rep. No. 92-451, pp. 23-24 (1971) (Report on the MPRSA) (the citizen-suit provision does not restrict or supersede "any other right to legal action which is afforded the potential litigant in any other statute or the common law").
 It might be argued that the phrase "any effluent standard or limitation" in Sec. 505(e) [33 U.S.C. Sec. 1365(e) ] necessarily is a reference to the terms of the FWPCA. We, however, are unpersuaded that Congress necessarily intended this meaning. The phrase also could refer to state statutory limitations, or to "effluent limitations" imposed as a result of court decrees under the common law of nuisance.
 Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 16 n. 26, 101 S.Ct. 2615, 2624 n. 26, 69 L.Ed.2d 435 (1981).
 
 
 [7]
 Under this interpretation, Sec. 1370(2) is not reduced to a nullity. The provision ensures that states retain their power to regulate discharges within their "waters (including boundary waters)." See supra n. 1
 
 
 [8]
 This construction is consistent with this court's former reading of the saving clause. In U.S. Steel Corp. v. Train, 556 F.2d 822, 830 (7th Cir.1977) we said, "Congress has chosen not to preempt state regulation when the state has decided to force its industry to create new and more effective pollution control technology." (Emphasis added.)